THOMSON-HOUSTON ELECTRIC CO. v. KELSEY ELECTRIC RAILWAY SPECIALTY CO. et al.

(Circuit Court of Appeals, Second Circuit. July 29, 1896.)

1. PATENTS—CONTRIBUTORY INFRINGEMENT.
   An injunction, on the ground of contributory infringement, may be granted against one who, by his advertisements and course of business, shows a willingness to co-operate with any infringer who may present himself, by making and selling to him a device or element of a patented combination, to be used in connection with other parts, obtained from a different source. Wallace, Circuit Judge, dissenting.

2. SAME—ELECTRIC RAILWAY TROLLEYS.
   It is not an infringement of the Van Depoele patent, No. 495,443, for an improvement in traveling contacts for electric railways, to furnish to a user of the invention a trolley stand, which is one of the elements of the combination, to replace the original stand, which has become broken,

or has otherwise lost its useful capacity. 72 Fed. 1016, modified. Wilson v. Simpson, 9 How. 109, followed. Davis Electrical Works v. Edison Electric Light Co., 8 C. C. A. 615, 60 Fed. 276, distinguished.

3. SAME.

One who purchases the apparatus covered by the Van Depoele patent, No. 495,443, for an improvement in traveling contacts for electric railways, has the right, immediately thereafter, to discard the element known as the "trolley stand," and purchase from another a different stand, which he conceives to be better suited to his purposes. 72 Fed. 1016, modified.

Appeal from the Circuit Court of the United States for the District of Connecticut.

This was a suit in equity by the Thomson-Houston Electric Company against the Kelsey Electric Railway Specialty Company and others for alleged infringement of the Van Depoele patent for an improvement in traveling contacts for electric railways. A preliminary injunction was granted by the court below (72 Fed. 1016), and the defendants have appealed.

Edward H. Rogers, for appellants.

Betts, Hyde & Betts, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. The circuit court of the United States for the district of Connecticut, after an exhaustive investigation of the validity and alleged infringement of letters patent No. 495,443, dated April 11, 1893, and issued to the administrators of Charles J. Van Depoele, decreed that the Winchester Avenue Railroad Company had infringed claims 6, 7, 8, 12, and 16 of the patent. The complainant in the suit was the Thomson-Houston Electric Company, the assignee of the patentees. 71 Fed. 192. The combination covered by these claims, and now used generally by the electric railroads of the country, consisted "generally in an electric railway having an overhead conductor, and a car for said railway, provided with a contact device carried by the car so as to form a unitary structure therewith, and consisting of a trailing arm, hinged and pivoted to the car so as to bridge the space between it and the conductor, and move freely both laterally and vertically, and said arm carrying at its outer end a contact device capable of being pressed upward, by a suitable tension device, into engagement with the underside of the conductor." The important and distinctive part of the invention was the trailing arm, hinged and pivoted to the car, and moving laterally and vertically, with a contact device at its outer end, capable of being pressed upward, by a suitable tension device, into engagement with the underside of the conductor. The novel element of "the overhead, underrunning, spring-pressed, laterally swinging contact arm" was of great utility, and has superseded pre-existing attempts at trolley-road equipment. The "trolley stand," so called, is the means by which the trailing arm is hinged and pivoted to the car with a capacity for lateral and vertical movement, and is pressed upward by some suitable spring. No particular form of stand was included in the Van Depoele invention, for any one of a number of forms would answer

the purpose.   The defendant the Kelsey Electric Railway Specialty Company manufactures a particular form of trolley stand, for which letters patent have been issued, which it has advertised for sale, and has also, in its advertisements, represented itself as a dealer in trolley poles and overhead trolley equipments.   Its trolley stand consisted, in the main, of a base secured to the car roof, a frame revolubly mounted upon the base so as to receive the end of a trolley arm, and springs by which tension upon the arm is produced.   The Thomson-Houston Electric Company having brought suit against the Kelsey Company for infringement of this Van Depoele patent, the circuit court for the district of Connecticut (72 Fed. 1016) granted a motion for an injunction pendente lite against its making or selling any apparatus embodying the subject-matter of any trolley bases devised or intended to be used in infringement of those claims of said patent which were found to have been infringed in the Winchester Case.   The present appeal is from this order.

The question, as presented in the affidavits and briefs, relates particularly to the manufacture and sale of trolley stands.   As evidence of an intention to infringe, the complainant relied upon the language of the defendant's advertisement, which offered for sale the stands and overhead trolley equipment generally.   The defendant admits that it has sold trolley stands, directly or indirectly, to electric companies which purchased their equipment originally from the complainant's licensees, either by way of repair, or because the purchasers wanted an improved stand.   It denies that it has knowingly sold to an infringer of the patent in suit, or to be used for the purpose of infringement.   The circuit judge was of opinion that the defendant was selling stands capable of, and designed for, an unlawful use, and that, inasmuch as they are useful only for the purpose of performing functions involved in the operation of the patent, there was a presumption of an intention that these stands should be so used, which was not dispelled by the affidavits.   The question being one of contributory infringement, the appellant urges that there was no sufficient evidence that the defendant had concerted, or was concerting, or intended to concert with any person for the infringement of the complainant's patent, and that, consequently, the injunction order either ought not to have been issued, or was too sweeping in its terms.

What contributory infringement is, and why it should be enjoined, was clearly shown in Wallace v. Holmes, 9 Blatchf. 65, Fed. Cas. No. 17,100,—the earliest case in this country upon the subject, and upon which the subsequent cases of contributory infringement rest. The complainant's patent in that case was for an improved lamp, which consisted of an improved burner, or metallic portion, and a glass chimney.   The defendant made and sold the improved burner, which must be used with a chimney, and, in order to make sales, exhibited the burners with chimneys to customers; and the circuit judge thought that a concert with others to use the patented article, as a whole, was a certain inference from the obvious facts in the case, and the efforts of the defendant to solicit sales by showing the operation of the whole patented article.   The willingness of the defendant in this case to aid other persons in any attempts which they may

be disposed to make towards infringement is also apparent. Its trolley stands are designed to be used in the patented system, and to be the means of enabling the trailing pole to perform its distinctive and novel part in the combination. It sufficiently appears from the defendant's advertisements and affidavits that it was ready to sell to any and all purchasers, irrespective of their character as infringers. A proposed concert of action with infringers, if they presented themselves, is fairly to be inferred from the obvious facts of the case; and an injunction order is the proper remedy against wrongful acts which are proposed, or are justly to be anticipated. But the defendant says, also, that the order which was granted is capable of too sweeping an interpretation, because it has a right to supply purchasers, who have acquired the right to use the patented combination, with its trolley stands, either by way of repair, or because the stands which were furnished to them were not adapted to the needs of the cars upon which they were placed; and it invokes the principle which was stated in Chaffee v. Belting Co., 22 How. 217, as follows:

"If a person legally acquires a title to that which is the subject of letters patent, he may continue to use it until it is worn out, or he may repair it or improve upon it as he pleases, in the same manner as if dealing with property of any other kind."

The complainant, which is utilizing its patent rights by the manufacture and sale of trolley-railroad equipments, and desires to compel purchasers to continue to supply themselves with its form of stands, replies that the defendant's sales are not for the purpose of repair, but are for the reconstruction of the patented combination, and that a reconstruction of a destroyed or worn-out combination is an infringement. This proposition is true, and examples of the cases to which it is applicable are found in Cotton-Tie Co. v. Simmons, 106 U. S. 89, 1 Sup. Ct. 52, and Davis Electrical Works v. Edison Electric Light Co., 8 C. C. A. 615, 60 Fed. 276. In the Cotton-Tie Case the continual use of patented ties, which consist of a band and buckle, was purposely destroyed by the purchaser, by cutting the band, after he had received the bale around which the tie was placed, and the parts were sold as waste material. A new purchaser bought the several parts, mended the bands, replaced the buckles, sold them to be used as ties, and was held to be an infringer. In the Edison Case the reconstruction was equally extensive. The infringer made a hole in the bulb of an Edison incandescent electric lamp, in which the carbon filament had been worn out, put in a new filament, having its ends cemented in platinum sleeves, fused a tube of glass into the open end of the bulb, exhausted the air, and sealed the bulb. Inasmuch as "the filament, duly charged, is the light-giving thing," the work of the infringer was the manufacture of a new lamp. The complainant, recognizing that the facts in these cases are not analogous to those in the record now before us, urges that, in order to constitute reconstruction of a patented device, it is not necessary that the structure should have been destroyed intentionally, or that the vital and peculiar element of the invention should have been worn out by use, but that the substitution of an important member of a

patented combination, which was intended to be permanent, in place of the corresponding member, which had been accidentally broken or has been worn out, is reconstruction, and that there is a recognized distinction between such a substitution, and the replacing of fragile members, whose life is necessarily short.   Reliance is placed upon the case of Wilson v. Simpson, 9 How. 109, which involved the question of the interest which the owners of a patented machine had in it after the expiration of the first term of a patent, where there had been a renewal and extension of it, and which has been sometimes supposed to establish the rule that the replacement by the purchaser of the parts of a patented machine, which must, from their nature, be temporary, is permissible, while in no event is the replacement permissible of a part which it was hoped would be permanent.   The case related to the right of a purchaser of a Woodworth planing machine to replace cutters, which ordinarily had a life of only 60 or 90 days, and, as a necessity, the opinion dwells upon that fact; but the decision did not make it a sine qua non, and did not intend to say that temporary cutters can be replaced, and that an element intended to be permanent, but accidentally broken in 30 days after it was purchased, cannot be replaced.   The distinction which the court was endeavoring to point out, and which it thought was well illustrated in the Woodworth planer, was the difference between the repair or replacement of a single element of a combination, and the manufacture of a new machine in place of one which had become useless.   The court says:

"We admit—for such is the rule in Wilson v. Rousseau, 4 How. 646—that when the material of the combination ceases to exist, in whatever way that may occur, the right to renew it depends upon the right to make the invention.   If the right to make does not exist, there is no right to rebuild the combination.   But it does not follow, when one of the elements of the combination has become so much worn as to be inoperative, or has been broken, that the machine no longer exists, for restoration to its original use by the owner who has bought its use.   When the wearing or injury is partial, then repair is restoration, and not reconstruction.   Illustrations of this will occur to any one, from the frequent repairs of many machines for agricultural purposes, also from the repair and replacement of broken or worn-out parts of larger and more complex combinations for manufactures.   In either case, repairing partial injuries, whether they occur from accident, or from wear and tear, is only refitting a machine for use.   And it is no more than that, though it shall be a replacement of an essential part of a combination.   It is the use of the whole of that which a purchaser buys, when the patentee sells to him a machine; and, when he repairs the damages which may be done to it, it is no more than the exercise of that right of care which every one may use to give duration to that which he owns, or has a right to use as a whole."

This distinction is both natural, and founded upon right reason, and gives to the patentee all the benefits to which he is entitled by the grant of the patent.   While it is not intended that a trolley stand should be broken, or should lose its useful capacity, either calamity may befall it; and the right to replace the injured part by a new stand, from any person who can supply the article, should be conceded by the owners of the patent.   It is not intended to permit the unauthorized substitution of the vital and distinctively new part of an invention in place of one worn out by use, as the

substitution of a new filament in an Edison incandescent lamp, or the substitution of a new for an old burner in the Wallace Case, supra; but the trolley stand is not the vital element of the invention, though a portion of it is an element of the combination. It is the means, and in most cases the nonpatented means, for there are numerous forms of these bases by which the pole is permitted to perform its functions.

The defendant also says that, in order to obtain the use of an improved trolley stand, purchasers from the complainant are sometimes willing to discard its stands, and substitute another form, which had its own advantages. For example, the trolley stand which is sold by the defendant is said to be less elevated above the top of the car than the stand of the complainant, and therefore it is said that the Norwalk Street-Railway Company found it necessary to change the stands which were furnished by the complainants, because of the low bridges recently constructed by a steam railroad over the tracks of the street electric road. A refusal to permit such a substitution is equivalent to a declaration that the street-railway company cannot be permitted to improve its stands, except by the consent of the complainant. If a purchaser from the complainant chooses, the day after his purchase, to substitute a stand which is better made, and better adapted to his peculiar needs, he has the right to do so. But it will be urged that such a permission opens the door to infringement, and permits a spoliation of conceded rights of the complainant. It does throw upon the defendant the duty of careful investigation into the objects of the purchasers of its stands, and of an abandonment of indifference as to whether they are seeking to trench upon the rights of the owners of the patent, or else, a liability to suffer the consequences of a violation of the injunction order.

The order is directed to be modified, without costs of this court, by adding the words: "It is not intended to enjoin the defendant against the sale of trolley stands by way of replacement of broken stands, or stands worn by use, or substitution for trolley stands previously sold by the complainant to purchasers from it, but this permission does not give authority to reconstruct or rebuild a combination which has been sold by the complainant."

WALLACE, Circuit Judge (dissenting). This case presents in my view an utterly unwarranted attempt on the part of the complainant to enlarge the monopoly which it has acquired as the owner of the patents in suit, and to dominate exclusively the manufacture and sale of articles which its patents do not cover, and which others have a legal and moral right to make and sell. The preliminary injunction by which the defendants are restrained from making or vending their trolley stands was granted without a particle of evidence that they had ever infringed any of the claims of the complainant's patents, and, as I think, without the slightest evidence that they threaten to do so. They are as much entitled to make and sell their trolley stands as they are to make and sell the rails, the poles, the wires, the screws, the paint, or any other

article which may be required for use by those who own and operate electric railways in which the improvements covered by the patents of the complainant are utilized. The country is crowded with electric railways which utilize these improvements, but the improvements do not consist in the trolley stand. They consist in various combinations of parts, of which a trolley stand, in some form, is one. These railways are generally owned and operated by corporations, a great number of which buy their outfit from the complainant, and thereby acquire the right to use the patented combinations during the life of the organized parts. Concededly, they have a right to repair their trolley stands, to substitute new ones for those old or worn out, or to substitute a better and improved kind for those originally bought of the complainant. The defendants have an equal right to make and sell the stands to such owners for that purpose.

The injunction was granted upon the theory that a case of contributory infringement had been shown. The only evidence of contributory infringement consists in the fact that the defendants are making, advertising, and selling their trolley stands to the public. That they are concerting with infringers, with a view to assist them in appropriating without compensation the inventions patented by the complainant, there is not a particle of evidence. Being entitled to sell their article, they are under no obligation, before selling it, to inquire whether the purchaser intends to make an illegal use of it. Privity with a wrongdoer is not to be inferred from the exercise of a legal right. The man who sells a gun or a knife would be guilty of an impertinence if he should inquire of the purchaser whether he intends to use it legitimately, and is under no duty to do so. The same rule applies to one who makes or sells an article which is not patented, but which may be used by the purchaser to work an infringement of a patent if he so chooses. One who assists another to infringe a patent is, of course, a tort feasor; and whether he is called a contributory infringer, or merely an infringer, is only a matter of nomenclature. But he does not assist or concert with another to infringe merely because he sells him an article which may be used to effect an infringement. In other words, participation in a wrong is not established by doing a lawful act, without evidence of an unlawful intention.

I think the order granting the preliminary injunction should be reversed.